326 S.W.2d 664 (1959)
John KASPER, Plaintiff in Error,
v.
STATE of Tennessee, Defendant in Error.
Supreme Court of Tennessee.
July 27, 1959.
On petition for Rehearing September 3, 1959.
*665 Schoolfield, Eaves & Taylor, James E. Carroll, Chattanooga, for plaintiff in error.
Thomas E. Fox, Asst. Atty. Gen., for the State.
SWEPSTON, Justice.
Plaintiff in error, John Kasper, hereinafter called defendant, was convicted for inciting a riot and sentenced to serve for a period of six months in the Davidson County Workhouse and pay a fine of $500.
There have been filed in behalf of defendant 20 assignments of error, some of which overlap, but counsel has not seen fit to file any written brief or argument in support of said assignments of error.
Under assignments 1, 3, 4 and 8 it is insisted that the court erred in not sustaining the motion to quash the array of jurors upon the alleged grounds that they did not comprise a cross section of the County either geographically or economically; that they were a biased and prejudiced panel of jurors holding strong opinions in opposition to defendant; in refusing to grant the motion for change of venue.
We have examined the record thoroughly in this regard and we find absolutely no merit whatever in these insistences. The trial judge heard ample evidence in regard thereto and gave the same most careful attention. Hence we overrule those assignments.
The second assignment of error is that there is no common law offense of inciting to riot because it is alleged that the indictment or presentment is based on the common law and that the same has been expressly repealed by the adoption of the State and Federal Constitutions on those subjects and that no legislation covering the subject has been enacted.
There is no merit in this insistence because Art. XI, Sec. 1 of the Constitution of this State expressly provides otherwise and it has been so held in Henley v. State, 98 Tenn. 665, 41 S.W. 352, 1104, 39 L.R.A. 126.
Assignments 5, 6 and 7 are that the evidence preponderates against the verdict and in favor of his innocence; the proof fails to show that as many as 3 people were assembled at any time as would be necessary to establish the existence of a riot; that the proof fails to show that a riot ever occurred, and if so, in the presence of the defendant.
It thus becomes necessary to refer to the evidence. The State offered the following evidence:
The defendant, a native of New Jersey, and a graduate of Columbia University, Class of 1951, came to Nashville, Tennessee, about the end of July, 1957. At that time there was considerable feeling and unrest among a substantial number of residents of Nashville because of a Federal District Court order requiring the first grades in all City schools to be integrated upon the opening of the September 1957 term of school.
The defendant had appeared before the City School Board in an attempt to prevent integrating the first grade in the public *666 schools. He began making speeches sometime in the early part of August around in various places. It was shown by the testimony of a Mr. Fullerton, a newspaper reporter for the Nashville Tennessean, that at a meeting on the first Sunday in August, 1957, the defendant said in substance "Well, he said that people were getting pretty excited about it (the school opening) and he said, we don't want any trouble here but people are getting pretty excited. I remember he said, I had a fellow come up to me and say, `John, why don't you hang the School Board.' He said, `I don't say we should do that' and he said `another fellow came up to me, John, I have got a shot gun, we might have to use it to defend myself and my family and I can do it.' He said, another fellow came up to me and said, `John, I don't want to have any trouble here but my kids aren't going to school with Negroes, and if I have some dynamite, I know how to use it.'"
This witness stated that the defendant kept repeating the above statement in substance and that in all these references that he made to violence he purported to be quoting somebody else and not saying these things himself.
This witness attended another meeting the latter part of the month of the same nature. The defendant continued speaking around in various places before the opening of schools on August 27 for enrollment of pupils. On one of those occasions he spoke in front of the Davidson County Courthouse and on that occasion he made extremely derogatory remarks about Governor Clement, Mayor West and other officials, including the School Board. He said the School Board had a Jew and Negroes on it and they were nothing but pushbuttons for the Mayor. He referred to Negro people generally as "niggers" and said the Jews were agitating and promoting this trouble with the Negroes to the point where the Negroes thought they were better than the people he was speaking to. He said the Negro is better than the Jew and that the Jews were Christ killers. Again he said he was not advocating any violence but there would be bombings, dynamiting, bloodshed and probably killings but regardless, they were not going to put Negroes in our schools. That statement brought on some loud talking and clapping of hands. On this occasion the defendant's hat was passed around among the crowd to take up a collection which defendant said was to defray the expense of printing literature and the money was turned over to him. The only literature passed out at the first meeting was announcement of the schedule of future meetings. At a subsequent meeting in the same spot, other literature to be referred to hereinafter was passed out.
On August 27, the enrollment date for the schools, the defendant appeared at at least five of the schools and made inquiry about the number of Negro children registered, if any, and created a disturbance by urging the people not to let their children go into the schools or urging them to withdraw them as a result of which a very substantial number of children were withdrawn from each of the schools.
Then on September 9, the day the schools were to begin classes, the defendant engaged in the same performance. For instance, at the Caldwell School there were some people there before the defendant arrived and they were quiet. After he arrived and began speaking, the crowd increased and became loud and traffic was blocked so that the police officer made him move on. Defendant in departing told the crowd to follow him to Buena Vista School. Then at Fehr's School where defendant appeared on September 9, there were 156 pupils there before he came and only 40 afterwards. The mob yelled for the lady principal to come out and they threatened to get her. During the disturbance the colored janitor's automobile was burned. After the crowd had dispersed, the schoolyard was filled with sticks, stones and broken bottles.
This principal definitely testified that part of the threats made against her were made while the defendant was talking to *667 the crowd asking them to boycott and picket the schools. She named more than 4 people in the crowd.
Then that night of September 9, the big show came off. The meeting started out in front of the War Memorial Building in Nashville but as the crowd grew in size and were blocking traffic on Capitol Boulevard, the meeting was moved to the steps of the Capitol Building. The crowd was estimated to be in the beginning a little more than 100 but increased to the maximum estimate by some witnesses of 700. At this meeting the defendant spoke his usual line of stating what would happen if the integration was proceeded with but was careful, of course, not to make any statements or threats as to what he would do himself personally. He designated pickets to go to some of the schools; he held up a rope with a noose in the end of it and suggested that a lot of people would like to see Z. Alexander Looby hanged (this latter person being a Negro lawyer and a member of the City Government of the City of Nashville). The defendant posed for a picture holding some wooden mallets crossed in his hands, these mallets being the type used by stonemasons.
At this meeting there was passed out with the name of the defendant on the reverse side of some printed material that stated that these were the last days of peace between the white and Negro races and tended to question the motive and sincerity of national, state and county officials and urged that the white people stiffen their backs and prevent the integration of schools with their shotguns. There was also passed out by the defendant or those aiding him in the conduct of his meetings and speeches a picture of a Negro boy kissing a white girl.
The evidence shows that the crowd reacted to these things as one would expect. Immediately thereafter, according to one witness, at least 150 people who had attended the meeting in front of the Capitol repaired to Fehr School where a riot occurred. The crowd was breaking glass and running all over everything.
About two o'clock A.M. that same night, the Hattie Cotton School was dynamited and partly demolished.
We deem it unnecessary to go into further detail as we are of opinion that there is ample evidence both direct and cirmumstantial, to fully support the verdict of the jury. We would like, however, to make this comment. The defendant's insistence is that he does not believe in violence and has never at any time advocated violence; that he came here for the purpose of promoting friendly race relations. He admits the general tenor of statements attributed to him by numerous witnesses, but insists that he was simply quoting predictions by others.
As for his alleged non-violence attitude, it seems to be a case of the voice of Jacob and the hand of Esau. As for race relations, his every move was consistent with and conducive to nothing but disruptive race relations.
Evidently we must overrule these assignments.
Assignments 10 and 14 relate to the refusal of the trial judge to permit counsel for defendant to cross-examine two witnesses relative to their being beaten by police officers and causing them to make statements. The State concedes that this was error but we do not think so under the circumstances of this case. These men did testify that they were beaten by the police and that they were afraid of the police but under questioning by the trial judge, they testified in the absence of the jury that regardless of their claim of having been beaten that what they had said in their statements and in their testimony was the truth. The trial judge was satisfied with their statements that they were telling the truth and he was very careful all through the trial not to get into side issues but to stick strictly to the charge in the indictment. We do not think that this was error but even so, in view of all the mass of evidence otherwise, we agree with the State that it is harmless error.
*668 The same thing may be said of assignment 19 with reference to Constable Peek. That is, the trial judge was not interested in Peek's conversation with the defendant when he arrested him and sought to elicit from defendant a history of his views and theories about Communism, race relations, etc.
Assignments 9, 11 and 12 relate to matters introduced in evidence consisting of a baseball bat, a mallet, etc., found in the car of witness Crimmons after he had been attending the defendant's meetings and about a piece of wire; also a sound film taken of the meeting on the night of September 9 showing the crowd in front of the Capitol.
Crimmons had been associating with the defendant, driving him around and also taking orders from him about picketing. It was proper to put these items found in his car before the jury to let them decide whether they were relevant to the charge in the indictment. The film was also properly authenticated and introduced for whatever it was worth and that also was for the jury. There is some question about the type of wire, whether it was suitable for discharging dynamite, but that is likewise a matter that was for the jury so that we can see no merit in these assignments.
We have examined the other assignments and find no merit in them. There is no doubt in anybody's mind that any citizen has a right to express his opinion about the opinion of the Supreme Court of the United States in the integration cases but the right of free speech is limited just as are all other so-called rights and when one goes beyond a proper expression of opinion and incites to riot, he has gone beyond the area of freedom of speech. The great Justice Oliver Wendell Holmes said that no one has a right to yell "Fire" in a crowded theater when there is no fire.
Before closing we wish to make the following comment. The trial judge made a preliminary statement to counsel that he would confine the evidence strictly to the charge in the indictment and there would not be tolerated any side issues. He enforced this ruling strictly and impartially as well as humanly possible. It is well that he did for many reasons including the fact that approximately fifty witnesses testified.
The judge commended counsel for the efficiency and propriety of their efforts. We most heartily commend the judge for his fairness and efficiency.
All assignments are overruled and the judgment below is affirmed.

Opinion on Petition to Rehear
SWEPSTON, Justice.
John Kasper has filed a petition to rehear in the above styled case. The same was filed by Kasper pro se on August 27, 1959, which is more than 10 days allowed for the filing of petitions to rehear and accordingly does not comply with Rule 32 of this Court.
In view of the statement in said petition that the petitioner is incarcerated and that it is "practically impossible" to employ new counsel on short notice, we have examined the petition.
The result of our examination is that no new argument appears therein, no new authority is adduced, and no material fact is pointed out as overlooked. Therefore, in accordance with said Rule 32 supra said petition is overruled.
The Clerk of this Court will notify said John Kasper by sending him a copy hereof addressed to him at P.M.B. 16391, Tallahassee, Florida.